KOENIG, Appellant, v. MILWAUKEE BLOOD CENTER, INC., and another, Respondents.

*March 4—March 31, 1964.*

For the appellant there was a brief by *Alfred J. Sapiro* and *Kersten & McKinnon,* attorneys, and *George P. Kersten* of counsel, all of Milwaukee, and oral argument by *George P. Kersten.*

For the respondent Milwaukee Blood Center, Inc., there was a brief by *Foley, Sammond & Lardner* and *James P. Brody* and *John R. Collins,* all of Milwaukee, and oral argument by *Mr. Collins.*

For the respondent Memorial Hospital there was a brief by *Wake, Prosser, Zimmermann & Quale,* and oral argument by *J. R. Wiedebach,* all of Milwaukee.

BEILFUSS, J.

*Issues.*

1. Does furnishing of blood for a transfusion by a hospital constitute a sale so as to give rise to an action for breach of warranty?

2. Do the pleadings or affidavits in opposition to motion for summary judgment set forth facts sufficient to warrant a trial on a cause of action for negligence arising prior to the abrogation of the doctrine of charitable immunity?

3. Do the provisions of the insurance policies purchased by the hospital and the blood supplier constitute waivers of charitable immunity?

*Breach of Warranty.*

The amended complaint of the plaintiff alleges a cause of action for breach of warranty against the hospital but not against the blood center. Therefore, we neither discuss nor decide whether a cause of action for breach of warranty could be asserted against the blood center which collected the blood and furnished it to the hospital.

The plaintiff was given blood and plasma by hospital personnel upon the direction of a physician while a patient at the hospital for treatment of injuries received in an automobile accident. A specific charge of $30 was made for the blood and transfusion with right to a rebate of $15 if the blood was replaced. Plaintiff contends that the furnishing of the blood constituted a sale under the Sales Act, that the hospital impliedly warranted that the blood and plasma or serum was fit and proper for use by the plaintiff, that he relied thereon, and that it was devoid of injurious or harmful substance. The hospital, in addition to its denial of these allegations, contends that the transfusion was an incidental part of an overall contract for the rendering of personal services rather than a sale of commodities.

The statute relied upon by plaintiff is sec. 121.15 (1), which provides:

"Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment . . . there is an implied warranty that the goods shall be reasonably fit for such purpose."

Whether a blood transfusion administered by a hospital constitutes a sale of goods or rendition of a service has not been heretofore determined by this court.

The majority rule of the cases of other state courts is that the administering of a blood transfusion to a patient by a hospital is not a sale within the meaning of the Uniform

Sales Act and, therefore, cannot be the basis of an action for implied warranty.

In *Perlmutter v. Beth David Hospital* (1954), 308 N. Y. 100, 123 N. E. (2d) 792,[1] the plaintiff alleged that he was given a blood transfusion containing jaundice viruses. The majority of the New York court of appeals held (pp. 104, 106, 107):

"The essence of the contractual relationship between hospital and patient is readily apparent; the patient bargains for, and the hospital agrees to make available, the human skill and physical material of medical science to the end that the patient's health be restored.

"Such a contract is clearly one for services, and, just as clearly, it is not divisible. Concepts of purchase and sale cannot separately be attached to the healing materials—such as medicines, drugs, or, indeed, blood—supplied by the hospital for a price as part of the medical services it offers. . . .

"The supplying of blood by the hospital was entirely subordinate to its paramount function of furnishing trained personnel and specialized facilities in an endeavor to restore plaintiff's health. It was not for blood—or iodine or bandages—for which plaintiff bargained, but the wherewithal of the hospital staff and the availability of hospital facilities to provide whatever medical treatment was considered advisable. The conclusion is evident that the furnishing of blood was only an incidental and very secondary adjunct to the services performed by the hospital and, therefore, was not within the provisions of the Sales Act. . . .

". . . And, indeed, semantics apart and looking at the transaction for what it actually is, there can be no doubt that, when one goes into a restaurant, he does so in order

---

[1] Other cases reaching similar results are: *Gile v. Kennewick Public Hospital Dist.* (1956), 48 Wash. (2d) 774, 296 Pac. (2d) 662; *Dibblee v. Dr. W. H. Groves Latter-Day Saints Hospital* (1961), 12 Utah (2d) 241, 364 Pac. (2d) 1085; *Hidy v. State* (1957), 3 N. Y. (2d) 756, 163 N. Y. Supp. (2d) 985; *Goelz v. J. K. & Susie L. Wadley Research Inst. & B. Bank* (Tex. Civ. App. 1961), 350 S. W. (2d) 573. The subject matter is discussed in an annotation in 59 A. L. R. (2d) 768, at page 777.

to buy what the restaurant in truth has to sell, namely, food. That is not so, though, when one enters a hospital as a patient; he goes there, not to buy medicines or pills, not to purchase bandages or iodine or serum or blood, but to obtain a course of treatment in the hope of being cured of what ails him."

In *Betehia v. Cape Cod Corp.* (1960), 10 Wis. (2d) 323, 103 N. W. (2d) 64, we held that a patron of a restaurant injured by a chicken bone in a chicken sandwich purchased by and served to him in a restaurant did state a cause of action for breach of implied warranty under the sales statute. The *Betehia Case* must be distinguished. As stated in *Perlmutter v. Beth David Hospital, supra,* the purpose of entering the restaurant was to buy food and the purpose of a patient entering a hospital is to receive professional technical treatment and care to restore his health.

We conclude that the furnishing of blood, plasma, or serum and the administering of these substances to a patient while in a hospital for treatment for illness or injury is only an incidental part of his main purpose for being there, namely, to obtain professional advice and care to regain his health. Even though there may be a specific and separate charge for a blood transfusion it is not a sale but a part of an overall service. The acts of the hospital being a service and not a sale do not give rise to an action for breach of implied warranty.

The trial court, consistent with the authority of cases of other jurisdictions,[2] did not distinguish between a sale or service but reasoned that the same facts could constitute either a breach of implied warranty or negligence and that

---

[2] *Gile v. Kennewick Public Hospital Dist.* (1956), 48 Wash (2d) 774, 296 Pac. (2d) 662; *Downes v. Harper Hospital* (1894), 101 Mich. 555, 60 N. W. 42; *Roosen v. Peter Bent Brigham Hospital* (1920), 235 Mass. 66, 126 N. E. 392.

reasons for the doctrine of charitable immunity should apply to either cause of action.

Although the result reached in this instance is the same, we adopt the rule that a blood transfusion, administered by a hospital, is a service rather than a sale.

### Negligence.

The trial court properly concluded from the affidavits submitted on the motions for summary judgment that both defendants, the hospital and the blood center, were in fact charitable institutions. The plaintiff does not now take issue with this finding.

In *Kojis v. Doctors Hospital, supra,* the doctrine of charitable immunity was abrogated as defense to negligent acts of charitable organizations and institutions to all causes of action arising after January 10, 1961. The facts upon which plaintiff relies occurred between August 9, 1958, and September 7, 1958. The doctrine of charitable immunity was, therefore, still existent at times material in this action.

The plaintiff does not seriously contend that the doctrine of charitable immunity is not a good defense to common-law negligence of the hospital and the blood center. He does contend that the facts here go beyond the protection of the charitable-immunity doctrine. He argues that the doctrine of *res ipsa loquitur* should apply and that both defendants were negligent *per se* by reason of violation of the "pure food and drug" statute, sec. 97.25, Stats.

In support of this position plaintiff cites *Wilson v. Evangelical Lutheran Church* (1930), 202 Wis. 111, 230 N. W. 708, holding charitable institutions liable as owners of a public building for violation of the safe-place statute, and *Smith v. Congregation of St. Rose* (1953), 265 Wis. 393, 61 N. W. (2d) 896, which refused to extend the doctrine of charitable immunity to bar an action for nuisance.

The doctrine of *res ipsa loquitur* does not create any new or different type of rights. In cases where the doctrine of *res ipsa loquitur* is applied the principal inquiry is still negligence. The doctrine is only a procedural device involved in those instances where defendant had exclusive control of the instrumentality causing the damage and the accident, which would not ordinarily have occurred without negligence on the part of the defendant. The procedural requirement is then that the defendant go forward with the proof to show he was not negligent. Even if we held that the doctrine of *res ipsa loquitur* could be used in this case, the inquiry is still negligence of the kind that is subject to the defense of charitable immunity.

Sec. 97.25 (1) and (4), Stats., known as the Pure Food and Drug Act, provides:

"(1) *Adulteration.* No person shall sell any drug or food which is adulterated.

"(4) *Drugs.* A drug is adulterated: (a) If when sold under a name recognized in the official United States pharmacopoeia or national formulary it differs from the standard of strength, quality or purity prescribed in the latest edition thereof; (b) If its strength, quality or purity falls below the professed standard under which it is sold; or (c) If it contains wood alcohol except when intended for external use only and is so labeled."

While plaintiff did not argue nor support by affidavit his claim of a violation of sec. 97.25 (1), Stats., in the trial court, he did allege a violation of the statute in his complaint as part of his cause of action in negligence against the hospital and did allege facts without reference to the statute which he claims states a violation of the statute in his claim against the blood center and has made reference to this claim in his brief filed in this court.

If we assume that the plaintiff has properly raised the issue and further assume there is a showing that either or

both defendants have violated the statute so as to be negligent *per se,* is such negligence beyond the protection of the charitable-immunity doctrine?

The most that a determination of negligence *per se* would do for the plaintiff would be to establish that defendants were negligent. This negligence would be in connection with the precise functions and purposes for which they were organized and operated as charitable organizations. From these circumstances the jury is permitted to draw the inference of negligence without the plaintiff's adducing proof of any specific acts of negligence on defendants' part.

### Waiver of Immunity by Purchase of Liability Insurance.

Both the hospital and the blood center had purchased liability insurance policies which were in force at the time in question. The plaintiff contends that the terms of these policies or endorsements thereto constitute a waiver of the defense of charitable immunity under the rule of *Marshall v. Green Bay* (1963), 18 Wis. (2d) 496, 118 N. W. (2d) 715.

In the *Marshall v. Green Bay Case* it appears that the city purchased a liability indemnity policy which specifically provided that the insurer would not raise the defense of governmental immunity.

We stated in *Marshall v. Green Bay, supra,* at pages 501 and 502:

"This important provision of the liability policy is commonly understood to mean the insurer, who is in control of the defense, will not raise such defense on behalf of the insured against the claimant. . . . We construe this agreement to be a waiver of governmental immunity by the city recognized and agreed to by the insurer. Such immunity cannot be resuscitated by subsequent action of the city or the insurer, or both. . . . We do not hold, however, a municipality

waives its immunity when it takes out a liability policy which does not contain the condition or agreement to refrain from raising the defense of governmental immunity."

The policy issued to the hospital contained the following provisions:

"I Hospital Professional Liability
"To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury, including death, sustained by any person, arising out of malpractice, error or mistake committed during the policy period (a) in rendering or failing to render to such person, or to the person inflicting the injury, medical, surgical, dental or nursing treatment, including the furnishing of food or beverages in connection therewith, or (b) in furnishing or dispensing drugs or medical, dental or surgical supplies or appliances if the injury occurs after the Named Insured has relinquished possession thereof to others, or (c) in handling or performing autopsies on deceased human bodies."

By these provisions the insurer agrees to pay on behalf of the hospital those claims that the hospital was legally obligated to pay. The hospital was not legally obligated to pay claims barred by defense of charitable immunity. Nowhere does a condition or agreement appear to refrain from raising the defense of charitable immunity. The hospital and the insurer, either singly or together, have not, therefore, agreed to waive the defense of charitable immunity.

The endorsement on the policy purchased by the blood center is as follows:

"WAIVER OF IMMUNITY ENDORSEMENT

"Municipal and Charitable Organizations

"It is agreed that in any claim or suit for damages covered by the policy, except by written request of the named insured by its duly authorized officer, the company will not use, either in the adjustment of claims or in the defense of suits

against the insured, the immunity of the insured from tort liability.

"This endorsement is executed by The Travelers Insurance Company as respects insurance afforded by that company only; it is executed by The Travelers Indemnity Company as respects insurance afforded by that company only."

Under this endorsement the directors of the blood center specifically reserved to themselves on behalf of the blood center the right to invoke the defense of charitable immunity. The affidavits and pleadings in support of the motion for summary judgment sufficiently show that the blood center did invoke its defense of charitable immunity and that the insurer was informed of this election.[3]

The provisions of this endorsement are likewise within the exception stated in *Marshall v. Green Bay, supra,* and charitable immunity was not waived by the purchase of liability insurance.

We agree with the trial court. Upon the record the defendants' motions for summary judgment, with costs, must be granted.

*By the Court.*—Judgment affirmed.

GORDON, J. (*dissenting in part*). I am unable to agree with the majority's opinion insofar as it construes the insurance policy of the Milwaukee Blood Center as not constituting a waiver of immunity. While I was one of those who dissented in *Marshall v. Green Bay* (1963), 18 Wis. (2d) 496, 118 N. W. (2d) 715, I believe that the holding of that case is controlling here.

Under the heading "Waiver of Immunity Endorsement," the Milwaukee Blood Center's policy contained the following provision:

---

[3] An agent of the insured was present at a meeting of the directors when they specifically made the election to raise the defense.

"It is agreed that in any claim or suit for damages covered by the policy, except by written request of the named insured by its duly authorized officer, the company will not use, either in the adjustment of claims or in the defense of suits against the insured, the immunity of the insured from tort liability."

The waiver of immunity which this court found had arisen as a result of the insurance policy in the *Marshall Case* is not reasonably distinguishable, in my opinion, from the foregoing waiver of immunity which appears in the policy of insurance of the Milwaukee Blood Center.